**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

**KENNETH J. ACKERMAN,**

       **Petitioner,**

**vs.**                                                    **Case No. 3:08cv96-MCR/WCS**

**WALTER McNEIL, et al.,**

       **Respondent.**

_____/

## REPORT AND RECOMMENDATION TO DENY § 2254 PETITION

This cause is a petition for writ of habeas corpus filed pursuant to 28 U.S.C. §
2254.  Doc. 1.  The petition was filed pro se, and Respondent filed a response with
relevant portions of the record.  Doc. 17.  References to exhibits are to those submitted
in paper form in support of the response.  A notice of appearance was filed by counsel
for Petitioner, and the reply was filed on Petitioner's behalf by counsel.  Doc. 33.
Respondent concedes that the § 2254 petition was timely filed.  Doc. 17, pp. 5-6.

**Procedural Background**[1]

At approximately 1:59 A.M. the morning of June 7, 1997, Petitioner was driving home in his Mercury Marquis. His car struck a young man named Chad Cowen. Upon impact, Cowen's body flew up and his head hit the base of the windshield, causing a crack at the bottom; hair samples were later recovered from the windshield. There was another crack higher on the windshield, possibly from Cowen's arm or hand hitting it. There were no skid marks.

Petitioner has maintained from the time of his first statement to the present day that he never saw Cowen, that he heard only a thud like something had been thrown at his car, and did not realize he might have hit a person. Petitioner claimed he noticed the damage to his car only after he arrived home, and then he consulted by phone with his brother, County Judge David Ackerman. Petitioner returned to the scene in a vehicle driven by his brother 35 to 45 minutes after the accident. When tested at the hospital around 4:35 A.M. Petitioner's blood alcohol level was 0.16, well over the legal limit of 0.08. A toxicologist testified that even if Petitioner drank three shots of Scotch after the accident, as explained ahead, his blood alcohol level at the time of the accident was no less than 0.10 and may have been as high as 0.17.

Defendant was represented by Fred Thomas Ratchford. The defense theory was that Petitioner was not impaired at the time of the accident, but gulped down a glass of Scotch whisky at his house, in the brief period he was there before returning to the

---

[1] The basic trial evidence is summarized in the opinion on direct appeal. Ackerman v. State, 737 So. 2d 1145, 1146 (Fla. 1st DCA 1999). It is also found in the order denying the Rule 3.850 motion. This summary comes from those summaries and from many places in the record.

scene of the accident.[2]  When Petitioner saw the extent of the damage and talked to his

brother on the phone, he was under stress and felt his blood pressure rising so he drank

to calm his nerves and lower his blood pressure.  Petitioner had a number of medical

problems including high blood pressure, and in that period (between arriving home and

returning to the scene) he was concerned that if he took the medication prescribed for

his blood pressure he would be unable to function.

The defense contention was that Cowen caused his own death by stumbling or

staggering into the road.  There was testimony that Cowen was on methadone and a

number of other drugs at the time of his death.  Others had seen him walking on the

road shortly before impact.  Ronald Gee, riding in a car driven by Brandon Nelms, said

he yelled at a man to get out of the road and then Nelms swerved to avoid hitting him.

Paramedic Richard Hawkins saw a man staggering in the road, concerning Hawkins

enough to turn his vehicle around so he could drive by and make sure the man was off

the road.  It was only minutes later that he got the emergency call about the accident.

It was not disputed that Petitioner was out from the early evening of June 6,

1997, first going to the "Beef and Ale" and then to "Banana Bobs," before he drove

home in the early morning hours of June 7.  He stopped and purchased food from

Subway on his way home, immediately before the accident.  The prosecution argued

that Petitioner was observed drinking throughout the night; Petitioner claimed he

ordered one drink at each of the two establishments and otherwise drank water.  There

was testimony by some witnesses, including Charles Stallworth, who waited on

---

[2] *See, e.g.*, Ex. C, pp. 179-207 and 1190-1240 (opening and closing arguments by Mr. Ratchford).

Petitioner at Subway just minutes before the accident, that Petitioner did not seem impaired nor did he smell of alcohol. The case came down to whether the jury believed Petitioner, that he was not impaired at the time of impact, was unaware that he had hit anyone, and drank a large quantity of Scotch only *after* the accident. Petitioner was convicted of leaving the scene of DUI manslaughter and sentenced to fifteen years imprisonment.

**Section 2254 Standard of Review**

"An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2).[3] But habeas corpus relief may be granted only if Petitioner has properly exhausted his federal claims in state court. § 2254(b)(1) and (c). To do so the federal claim must be fairly presented to the state court, to give the State the opportunity to pass upon and correct alleged violations of federal rights. *See* Baldwin v. Reese, 541 U.S. 27, 29, 124 S.Ct. 1347, 1349, 158 L.Ed.2d 64 (2004) (citations omitted); Duncan v. Henry, 513 U.S. 364, 365-366, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995). While it is not necessary that the petitioner cite "book and verse" of the Constitution, the state court must be alerted to the fact that a federal constitutional claim is raised. Duncan, 513 U.S. at 365-366, 115 S.Ct. at 888 (citations omitted); *see also* McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005) (holding that a petitioner

---

[3] If no constitutional claims are raised, then §2254 is inapplicable and the exhaustion inquiry is irrelevant. Engle v. Isaac, 456 U.S. 107, 120, n. 19, 102 S.Ct. 1558, 1567, n. 19, 71 L.Ed.2d 783 (1982).

must "do more than scatter some makeshift needles in the haystack of the state court record") (citations omitted).

The petitioner also "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S.Ct. 1728, 1732, 144 L.Ed.2d 1 (1999); Pope v. Rich, 358 F.3d 852, 854 (11th Cir. 2004) (applying this one complete round requirement to state collateral review process as well as direct appeal). If a claim is not fairly presented through one complete round of state court review and review is no longer available in state court, it is procedurally defaulted and the petitioner must demonstrate cause and prejudice for the default *or* a miscarriage of justice. Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct. 2565, 115 L.Ed.2d 640 (1991); McCleskey v. Zant, 499 U.S. 467, 494-95, 111 S.Ct. 1454, 1470-71, 113 L.Ed.2d 517 (1991).[4]

For properly exhausted claims, there are limitations on this court's review of state court findings of fact.

> Under 28 U.S.C. § 2254(d)(2), a federal court may not grant a state prisoner's application for a writ of habeas corpus based on a claim already adjudicated on the merits in state court unless that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Under § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the

---

[4] The miscarriage of justice exception applies only to extraordinary cases, where a constitutional violation has probably resulted in conviction of an innocent person. McCleskey v. Zant, 499 U.S. 467, 494-95, 111 S.Ct. 1454, 1470-71, 113 L.Ed.2d 517 (1991). *See also* House v. Bell, 547 U.S. 518, 536-537, 126 S.Ct. 2064, 2076-2077, 165 L.Ed.2d 1 (2006) (explaining what must be shown to demonstrate actual innocence as a "gateway" to review of a defaulted claim).

burden of rebutting the presumption of correctness by clear and convincing evidence."

Wood v. Allen, 558 U.S. __, 130 S.Ct. 841, 845, 2010 WL 173369 (2010).[5]

"[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Wood, 130 S.Ct. at 849, *citing* Williams v. Taylor, 529 U.S. at 411, 120 S.Ct. at 1522 (discussing the term "unreasonable" as used in § 2254(d)(1)) *and* Rice v. Collins, 546 U.S. 333, 341-342, 126 S.Ct. 969, 976, 163 L.Ed.2d 824 (2006) ("[r]easonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination.").  In Wood the Court found the state's factual finding that counsel made a strategic decision was reasonable, and "[a]s for any evidence that may plausibly be read as inconsistent with the finding that counsel made a strategic decision, we conclude that it does not suffice to demonstrate that the finding was unreasonable."  130 S.Ct. at 850 (footnote omitted).

As to legal findings, a petitioner is entitled to federal habeas relief only if the state court's adjudication of the merits of the federal claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law,

---

[5] The Court in Wood found the state court's adjudication not an unreasonable determination of the facts in light of the evidence presented under § 2254(d)(2) so found it unnecessary "to decide whether that determination should be reviewed under the arguably more deferential standard set out in § 2254(e)(1)."  *See also* Rice v. Collins, 546 U.S. 333, 338-339, 126 S.Ct. 969, 974, 163 L.Ed.2d 824 (2006) (parties disagreed on whether presumption of correctness of § 2254(e)(1) applied, but even assuming that only § 2254(d)(2) applied, the state court's decision was not an unreasonable determination of the facts in light of the evidence presented).

as determined by the Supreme Court of the United States." § 2254(d)(1). "[C]learly

established Federal law, as determined by the Supreme Court of the United States,"

refers only to holdings (rather than *dicta*) of the Supreme Court, but decisions of lower

federal courts may be considered to the extent that they demonstrate how those courts

applied Supreme Court holdings. Hawkins v. Alabama, 318 F.3d 1302, 1309 (11th Cir.

2003) (citations omitted) ("The decisions of other federal circuit courts (and our

decisions for that matter) are helpful to the AEDPA inquiry only to the extent that the

decisions demonstrate that the Supreme Court's pre-existing, clearly established law

compelled the circuit courts (and by implication would compel a state court) to decide in

a definite way the case before them."). *See also*, Carey v. Musladin, 549 U.S. 70, 74-

77, 127 S.Ct. 649, 653-654, 166 L.Ed.2d 482 (2006) (§ 2254 refers to holdings, rather

than *dicta*, of the Supreme Court, collecting circuit cases "[r]eflecting the lack of

guidance from this Court," on the issue).

   The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have

independent meanings. Williams v. Taylor, 529 U.S. 362, 404-406, 120 S.Ct. 1495,

1519-1520, 146 L.Ed.2d 389 (2000); Bell v. Cone, 535 U.S. 685, 694, 122 S.Ct. 1843,

1850, 152 L.Ed.2d 914 (2002) (citing Williams).

> Under the "contrary to" clause, a federal habeas court may grant the writ if
> the state court arrives at a conclusion opposite to that reached by [the
> Supreme] Court on a question of law or if the state court decides a case
> differently than this Court has on a set of materially indistinguishable facts.
> Under the "unreasonable application" clause, a federal habeas court may
> grant the writ if the state court identifies the correct governing legal
> principle from this Court's decisions but unreasonably applies that
> principle to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. at 412-413, 120 S.Ct. at 1523; 535 U.S. at 694, 122 S.Ct. at 1850.  *See also*, Panetti v. Quarterman, 551 U.S. 930, 953-954, 127 S.Ct. 2842, 2858-2859, 168 L.Ed.2d 662 (2007) (discussing the unreasonable application standard) (citing Williams, other citations omitted).

"Avoiding these pitfalls [described in Williams v. Taylor] does not require citation of our cases – indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."   Early v. Packer, 537 U.S. 3, 8, 123 S.Ct. 362, 365, 154 L.Ed.2d 263 (2002) (emphasis in original).  Further, "whether a state court's decision was unreasonable must be assessed in light of the record the court had before it."  Holland v. Jackson, 542 U.S. 649, 652, 124 S.Ct. 2736, 2738, 159  L.Ed.2d 683 (2004).

The basic law governing ineffective assistance of counsel claims was clearly established in Strickland v. Washington, 466 U.S. 668, 690, 694, 104 S.Ct. 2052, 2066, 2068, 80 L.Ed.2d 674 (1984).  *See* Williams, 529 U.S. at 405-406, 120 S.Ct. at 1519-1520; Bell, 535 U.S. at 694-695, 122 S.Ct. at 1850.  Under the two part test of Strickland, Petitioner must demonstrate both deficient performance and prejudice to the outcome.

To establish deficient performance, a petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  466 U.S. at 690, 104 S.Ct. at 2066.  In reviewing the claim, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  466 U.S. at 690, 104 S.Ct. at 2066.  "[B]ecause counsel's conduct is presumed reasonable, for a

petitioner to show that the conduct was unreasonable, a petitioner must establish that *no competent counsel* would have taken the action that his counsel did take." Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc), *cert. denied,* 531 U.S. 1204 (2001) (emphasis added). *See also* Fugate v. Head, 261 F.3d 1206, 1217 (11th Cir. 2001) (citing Chandler). Where trial counsel's performance was objectively reasonable, the fact that another reasonable lawyer would have pursued a different course is immaterial whether or not trial counsel actually considered that different course of action. 218 F.3d at 1315, n. 16 (citations omitted). As it is an objective inquiry, it "matters little" if, after the conviction, counsel concedes his performance was deficient. *Id.* (citations omitted).

To demonstrate prejudice under Strickland, Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S.Ct. at 2068.

Although Strickland explained the performance and prejudice prongs of analysis, "there is no reason . . . to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S.Ct. at 2069. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.*

A state court's adjudication of an ineffective assistance claim does not satisfy the "contrary to" language of § 2254(d)(1) even if this court might have applied Strickland differently. Williams, 529 U.S. at 406, 120 S.Ct. at 1520; Bell, 535 U.S. at 698, 122

S.Ct. at 1852.  To determine whether the state court's adjudication was an

"unreasonable application" of Strickland, Petitioner "must do more than show that he

would have satisfied *Strickland's* test if his claim were being analyzed in the first

instance . . . .  Rather, he must show that the [state court] applied *Strickland* to the facts

of his case in an objectively unreasonable manner."  Bell, 535 U.S. at 698-699, 122

S.Ct. at 1852 (*citing* Williams).  "[T]he most important point is that an *unreasonable*

application of federal law is different from an *incorrect* application of federal law."

Williams, 529 U.S. at 410, 120 S.Ct. at 1522.

**Legal Analysis**

    **Ground One**

    Petitioner claims ineffective assistance of counsel in the context of his pre-arrest

interview, also asserting five separate "points" within ground one.  Doc. 1, pp. 6-11.[6]

Petitioner notes that the accident occurred in the early morning hours of June 7, 1997,

that he hired Ratchford on June 8, 1997, and the police interview was held in counsel's

office on June 10, 1997.  *Id.*, pp. 6-7.  Petitioner asserts ineffectiveness with respect to

this "pre-arrest" interview at Ratchford's office.  The five separate "points" are

addressed ahead, following the general discussion.

    Petitioner asserts that these cumulative errors cannot be characterized as trial

tactics or defense strategy because they were plain, unreasonable, and no competent

lawyer would have taken the actions taken by Ratchford.  He asserts counsel's acts or

---

[6] The court references the pages of the petition as numbered by Petitioner.  They
are off by one from the page numbering in ECF (electronic case filing), as page 2 is the
first page of the document as scanned in ECF.

omissions with respect to allowing the pretrial interview aided the state and influenced

the verdict, as evidenced by the jury's request to hear the interview tape during

deliberations.

The audiotape was played for the jury (with some interruptions for argument and

to identify the voices of people speaking) during the testimony of Investigator Brian

Barton of the Pensacola Police Department.  Ex. C, pp. 810-844.[7]  On the tape, Barton

advised Petitioner at the time of the interview:

> Ken, like I told you earlier before we turned the recorder on, basically most
> of the information we need it just to fill in the accident report.  The first few
> questions I have are directly that, to fill in the blanks on the accident
> report.  When I've got that information, there is some other  information
> that could go either way.  I will let you know when I've got the information
> for the accident report and a couple other questions I have.  If you don't
> feel comfortable answering them, or Mr. Ratchford doesn't feel
> comfortable with you answering them, I'll just let – you know, you've got
> enough say, and we'll go on to that.  Okay?

*Id.*, p. 811.  At this point at trial, Ratchford interrupted the playing of the tape, and at

sidebar said that he did not want waiver of the accident privilege as to this portion

(which he did not consider prejudicial) to be construed as a waiver of other portions.  *Id.*,

pp. 811-813.

Continuing with the tape, Petitioner told Barton he was in the right lane nearest

the curb heading north on 9th Avenue, going exactly 35 miles per hour.  *Id.*, pp. 816-

817, 831.  During the interview, counsel interjected that Petitioner knew the exact miles

per hour because he was using his cruise control, and Petitioner said he used cruise

control automatically, all the time, day and night.  *Id.*, p. 817.  Petitioner said he used

---

[7] It was also played, on the request of the jury, during deliberations.  Ex. C, pp. 1269-1292.

9th Avenue regularly. *Id.*, p. 818. He described his medical problems, recent surgery, and the medications he was taking. *Id.*, pp. 818-821.

After explaining "you don't have to answer this," Barton asked Petitioner if his medications caused ill effects. *Id.*, p. 819. Counsel asked what he meant, and it was explained he meant causing Petitioner blackouts or impairment. *Id.* Petitioner responded that he experienced some stomach upset. *Id.*

Barton continued, and told Petitioner "some of this information actually relates to the accident report," but also "relates to the homicide report, so I'm not going to hold you to what's required by law for the accident report." *Id.*, p. 821. He said to "feel free to just acknowledge the fact that you would rather not answer those questions." *Id.*

Petitioner told Barton it happened when he was heading home; he had stopped to buy sandwiches on his way home from Banana Bob's. *Id.*, pp. 821-822. Asked if he had been drinking, Ratchford interjected that "he had a few drinks already." *Id.*, p. 822. Ratchford said that Petitioner had met some people there, including Patty Mohan, who had told counsel that she and Petitioner danced from 10:00 or 10:30 until closing, barely sitting down. *Id.*, pp. 822-823. Mohan had arrived in a limousine with five other women, who were having a bachelorette party. *Id.*, pp. 823-824. Counsel said Mohan saw him with a beverage but did not know what it was, and a bartender would say she served him only one drink. *Id.*, p. 824. He said that the "fact is at some time during the evening [Petitioner] switched over and started drinking water." *Id.* Counsel said Petitioner and Mohan's group left around the same time, at closing. *Id.*, p. 825. Barton said it might be irrelevant but asked if the second sandwich was for someone else, and Petitioner said he got it for a trip he was taking Sunday. *Id.*, pp. 826-827.

Petitioner told Barton that after he was at home and saw the damage to his car "it had just struck me that something happened."  *Id.*, p. 827.  He said that he "had no sense what had happened," but his "mind was racing," and his "heart was beating."  *Id.* Asked for an idea of the size of the glass he used for the Scotch, Petitioner said "it was probably a 16-ounce glass, but I certainly didn't fill it up.  I'd say there were a good three shots in there, maybe more.  I drank most of it . . . ."  *Id.*, pp. 827-828.

Petitioner told Barton he was at his house "less than 30 minutes, maybe even closer to 15."  *Id.*, p. 828.  Petitioner said when he saw what had happened to his car he did not know what could have happened, so he called his brother.  *Id.*, pp. 829-830. Petitioner said he was going to call the police, and his brother told him to come to his house.  *Id.*, pp. 829-830.

Barton showed Petitioner a diagram or photograph of the intersection and said if counsel and Petitioner felt comfortable, Barton would ask him additional questions.  *Id.*, p. 830.  Petitioner said he did not feel he could pinpoint exactly where he was when he felt something or heard the noise.  *Id.*, p. 831.  Petitioner said he had slowed down where there was some light to look, but saw nothing in his rearview mirror.  *Id.*, p. 832. He did not recall if he looked in the side mirrors.  *Id.*  Counsel pointed out that when Petitioner drove away from the sandwich shop, he had the air conditioner on high, the radio loud enough to hear over the fan, and he was eating a bag of chips.  *Id.*, p. 833. Petitioner said what he heard "was not that loud."  *Id.*, p. 834.  He said recently he heard a noise while parked in his car, and the sound was from kids throwing water balloons.  *Id.*  He said he had never hit anything except for an accident with another car, and had "never hit a pedestrian or a dog or anything that I would know the sound of,"

that "the water balloons are about as close as it gets." *Id.*, p. 835. Petitioner said he did

not see other traffic or pedestrians in the area at the time. *Id.*, pp. 835-837. Counsel

asked Petitioner, in front of Barton, whether he had any reason to believe he had hit a

person, and Petitioner said no. *Id.*, p. 837.

Counsel said Petitioner did not know that the windshield was broken or that there

was any damage to the car until after he was home. *Id.*, p. 838. Petitioner explained

that the windshield needed to be cleaned, and had some scratches on it from broken

windshield wipers, and there was a spider crack that had started some time earlier. *Id.*,

pp. 838-839. Petitioner said he was not sure where it was (on the street) that he felt

something, and counsel said Petitioner knew it was north of Texar and south of

Fairfield, but was not certain. *Id.*, pp. 840-841.

Petitioner told Barton he was wearing a seat belt, and that he does not need

glasses except for reading. *Id.*, pp. 842-843.

It was stipulated that the statement to Barton was made on June 10, the Tuesday

after the accident which occurred in the early hours of Saturday, June 7. *Id.*, p. 844.

After direct examination of Barton and playing the tape to the jury, Barton was

cross examined by Ratchford. Barton recalled that there was some conversation before

the statement was recorded. *Id.*, p. 845. He did not recall that Petitioner was not

feeling well, but remembered that Petitioner was very remorseful and upset about the

incident. *Id.*

Ratchford testified at the Rule 3.850 hearing that he graduated from law school in

1973, started in the Public Defender's Office, then went into private practice where he

specialized in DUI cases around 1982. Ex. J, pp. 787-788.[8] He said he did 25 to 40

trials a year. *Id.*, p. 788. Ratchford said he had known Barton many years, and the

interview was set up in Ratchford's office. *Id.*, pp. 791-792.

Ratchford said he explained to Petitioner that it was in his best interest to do the

interview. *Id.*, p. 793. He said that the media was "playing up" the fact that Petitioner

was an attorney and his brother a judge, with the innuendo that there was a cover-up

planned, so Ratchford thought it was a smart move for Petitioner to show he was not

hiding anything. *Id.* He felt it might "stave off" prosecution. *Id.*, p. 795. Ratchford

recalled a reluctance by Petitioner to do the interview, but said Petitioner was not

befuddled or sick, and agreed to it when Ratchford explained this reasoning. *Id.*, p. 794.

He said that although Petitioner did not look good the day of the interview, he appeared

to be mentally sharp. *Id.*, pp. 794-795.

Ratchford said he did not think they made a mistake or lost any advantage by

making the statement, and it was a reasonable risk if it would avoid prosecution and

arrest. *Id.*, pp. 797-798. Ratchford said he put more into this case than any he could

think of as far as pretrial preparation. *Id.*, p. 798.

After the evidentiary hearing, the Rule 3.850 court found that trial counsel's

strategy was to cooperate from the beginning to avoid any appearance of a cover up, in

---

[8] Ex. J is the full record of the Rule 3.850 appeal. References are therefore to the pages of the record (which appear at the middle bottom of the page), rather than the transcript pages (which appear at the upper right). The record pages of the evidentiary hearing transcript referenced here do not correspond to the state trial court's citation to the transcript pages.

the hopes that Petitioner would not ever be charged or prosecuted. Ex. J, p. 981. The

court rule:

> While in hindsight this approach did not work, this Court does not find that
> such a strategy constitutes deficient performance. Effective counsel as
> guaranteed by *Strickland* does not require a successful outcome but
> rather a competent and effective representation. Trial counsel's strategic
> decision to cooperate with the police to avoid an arrest was not ineffective
> and [Petitioner's] claim fails the first prong of the *Strickland* test.

*Id.*

This determination of fact that counsel made a strategic decision is well

supported throughout the record.[9] The determination that pursuing this strategy did not

constitute deficient performance is not contrary to or an unreasonable application of

Strickland. Ratchford had handled many DUI cases,[10] and said this was not a typical

DUI case. "Representation is an art, and an act or omission that is unprofessional in

one case may be sound or even brilliant in another." Strickland, 466 U.S. at 693, 104

S.Ct. at 2067; Ward v. Hall, 592 F.3d 1144, 1163 (11th Cir. 2010) ("echo[ing] the

caution" of Strickland and quoting this sentence). It must be remembered that then, as

today, Petitioner insists that he was not driving impaired and did not see or hear a

human being hitting his windshield. Cooperating immediately would tend to show that

---

[9] In Wood v. Allen, it was argued that counsel could not have made such a strategic decision as a factual matter, because there was no reasonable justification for the allegedly strategic decision. The Court said this "conflates the question whether a decision was strategic with the question whether a strategic decision was reasonable." 130 S.Ct. at 850, n. 3.

[10] Petitioner's brother testified that they hired Ratchford the same or next day following the accident as was one of the top DUI defense lawyers. Ex. J, p. 708. Petitioner agreed that one reason they hired him was that counsel had a reputation as "a DUI whiz defense lawyer." *Id.*, p. 761.

Petitioner genuinely had nothing to hide, that he knew he was not intoxicated and did not know he had hit someone at the time of the accident. This was to be a high profile case given the status of Petitioner and his brother, and rumors of a cover-up were to be avoided. There might be less pressure to pursue a prosecution or, in particular, to pursue severe punishment, where the person has cooperated from the beginning. Counsel was an experienced lawyer in this particular kind of case, and the presumption of reasonableness is even stronger for experienced counsel. Chandler, 218 F.3d at 1316 and nn. 18, 19; Provenzano v. Singletary, 148 F.3d 1327, 1332 (11th Cir. 1998) ("[o]ur strong reluctance to second guess strategic decisions is even greater where those decisions were made by experienced criminal defense counsel.") (citations omitted).

As the state court's decision does not satisfy § 2254(d) on this prong of Strickland, and both prongs must be satisfied for a finding of ineffectiveness, it is not necessary for this court to address prejudice. Still, it is hard to see how the decision to recommend the interview could have prejudiced Petitioner as the interview was consistent with Petitioner's trial testimony and his defensive theory.[11] The jury heard Petitioner tell his version of the facts both in the interview and at trial, and could judge his credibility for themselves. Coming forward and admitting to drinking immediately

---

[11] Another strategy would have been to remain silent both in the interview and at trial. Had Petitioner's attorney pursued that strategy, the prosecution would have presented witnesses to show that Petitioner spent seven hours in two bars, headed home at about 2:00 a.m., hit a pedestrian with enough force that he cracked his windshield, did not stop, went home and called his brother, who was a County Judge, and tested with a blood alcohol level of 0.16 two and one-half hours later. There would have been no evidence that Petitioner drank Scotch after the accident. It was not a promising strategy.

after the accident, in a statement made before the blood alcohol result was received, could be considered as lending credibility to the statement. Ratchford, an experienced DUI defense attorney, even afterwards did not think that they made a mistake or lost any advantage by talking to Barton, and felt that it was a reasonable risk to take if it could avoid prosecution. Ex. J, pp. 797-798.[12]

The big problem for the defense (and for Petitioner's credibility) was that Petitioner was driving a car which hit an young adult man. The victim's body flew up, denied hood of Petitioner's car, and the victim's *skull cracked the windshield*, leaving hair in the glass. There were no skid marks. But regardless of whether the impact was avoidable, it is hard to imagine how anyone driving a car in that situation – impaired or not – could possibly drive away unaware that such a thing happened.[13]

### Points One and Two

Petitioner claims that counsel failed to advise him of the legal consequences of participating in the pre-arrest interview. Specifically, as point one, Petitioner faults counsel with failing to advise him that any statement could potentially be used against him if criminal charges were brought; that the accident report privilege did not apply

---

[12] Here the lines between the deficient performance and prejudice under Strickland blur. As it is hard to understand even in hindsight how the interview as a whole was prejudicial to the defense since that was the defense all along, this also supports the finding that counsel's performance at the time was objectively reasonable.

[13] Lytell Ford, who lived at the corner of 9th and Hatton, was awakened that night by a "boom like noise," and went to his window expecting to see an accident. Ex. C, pp. 275-280. Even if Ford was (as he admitted on cross examination) a light sleeper, he was sleeping inside of his house nearby the accident. Petitioner was driving the vehicle, just inches from the windshield when the impact occurred. If Ford heard the impact, Petitioner should have heard it.

under Florida law because Petitioner left the scene of the accident; that arrest and prosecution were probable or highly likely; that a statement should only be given if immunity was guaranteed or, alternatively, that it was important to be aware of statements given regarding the accident report and statements pertaining to a homicide; that he should remain silent when asked about a homicide; and that counsel should have told him he faced only minimal sanctions if he declined an interview.  *Id.*, pp. 7-8. Petitioner claims (as point two) that counsel failed to "[set] a demarcation line between questions related to the accident, and those concerning the homicide investigation."  *Id.*, p. 9.  He claims the tape reveals his counsel did not object or advise him not to answer when asked questions about the homicide, and that counsel narrated Petitioner's actions prior to the incident "without regard to a demarcation line."  *Id.*  The claim that counsel narrated answers is addressed ahead as to point four.

Petitioner claims that, had he been properly advised by counsel he would not have participated in the pre-arrest interview, and the prosecution would not have learned much of the information which "enabled [it] to reshape the facts and build the case to their advantage."  Doc. 1, pp. 8 and 9.

As to this claim, the Rule 3.850 court found:

> The Defendant claims that trial counsel failed to properly advise the Defendant as to what portions of the interview were covered by the accident privilege and what portions were part of the homicide investigation that the Defendant did not have to answer.  Again the tape itself shows that the Defendant was made well aware regarding what portions of the interview related to the accident privilege and what portions were regarding the criminal investigation.  The whole purpose of the interview was to cooperate with the police and stem off prosecution.  This was reiterated by trial counsel during the evidentiary hearing and the Defendant's claim with regards to this matter is without merit.  (EH. p. 272-275).

Ex. J, p. 982.  This ruling is not contrary to or an unreasonable application of Strickland,

nor based on an unreasonable determination of facts in light of the evidence presented

in state court.  The tape reflects awareness by all involved of the difference between the

accident report and homicide report, and Petitioner was advised more than once that he

did not need to answer any questions with which he or counsel were uncomfortable.

The open conversation was entirely consistent with the strategy to be cooperative in the

hope of avoiding prosecution.

### Point Three

Petitioner claims that after a transcript had been made of the interview, it was

discovered that "misstatements / factual errors were present, [and] counsel failed to

submit a supplemental statement to police investigators (correcting the errors that were

discovered) in order to preserve [his] corrected position for the trial."  *Id.*, p. 9.

Specifically, counsel said at the interview that Petitioner had a few drinks at Banana

Bobs, but (Petitioner claims) the truth was that he only had one drink there.  *Id.*  It was

stated at the interview that Petitioner had three *shots* of Scotch after he got home that

evening, but the correct amount was three *fingers*, which, Petitioner claims, would have

been more like six or seven shots.[14]  *Id.*  Petitioner contends he told counsel about

these problems, but counsel made no corrections before trial, and, therefore, the

prosecution was able to impeach him with the interview during cross examination.  *Id.*,

pp. 9-10.

---

[14] Counsel agreed at the evidentiary hearing that, with a blood alcohol of 0.16 at 4:35 a.m., "the more he drank when he got home, the better off the Defense was."  Ex. J, p. 833.

The state court rejected this claim:

> Part of the Defendant's strategy and explanation was that his blood
> alcohol level was high due to him drinking after he arrived home.  The
> Defendant argues that he drank when he got home because the alcohol
> helped his high blood pressure.  The Defendant claims that counsel
> should have submitted a "supplement," as the Defendant remembered
> drinking more alcohol that night at home than he had originally told the
> police.  The flaw with this argument is that the Defendant testified to this at
> trial and even if trial counsel submitted such a "supplement" it would not
> prevent the State from submitting the original answers to show the
> Defendant had changed his story.  (T. p. 1090, 1140-1141).  Thus, trial
> counsel was not ineffective in failing to take action that would not have
> benefitted his client, and possibly would have prejudiced him even further.

Ex. J, p. 982.

Whether the interview was "supplemented" immediately afterwards or at trial, "supplementation" could be seen as changing the story to suit the evidence.  Changing some statements (by himself or counsel) shortly after the interview might be seen as coaching by counsel, whereas on the stand, Petitioner could explain in his own words what he had meant by three shots.  What Petitioner considered "fingers" rather than "shots," and why he used one description to mean another, could be explained in his testimony.[15]  Ratchford admitted that Petitioner told him about the shots versus fingers problem before they received the blood test results, but said that "[c]orrecting any

---

[15] Petitioner testified that, in the period immediately after the accident he filled the glass (shown to the jury) with Scotch to just below the blue mark on the glass.  Ex. C, p. 1140.  Asked if he considered this "three good shots," he said it was more, and said he thought his statement to Barton was true when he said it, "because I was not thinking in terms of shots.  I didn't measure this drink when I poured it into the glass, Mr. Paulk.  I took the bottle and just spilled it in." *Id.*, p. 1141.  He said he used the term shots thinking it was the same as fingers, and after he got his statement on tape he poured some Scotch into a glass to where he remembered pouring it then.  *Id.*  He also pointed out (as set forth, *infra*), that on the day of the interview statement, he was taking Xanax and was not even able to drive himself to the lawyer's office.  *Id.*, p. 1142.

misstatement at any time is a problem." Ex. J, pp. 830-831.  He thought he called

Barton to make the correction but was not sure, but Ratchford "didn't feel was

particularly important" "whether it was three shots or three fingers."  *Id.*, p. 832.  The

defense was that Petitioner was stressed, felt his heart racing, and quickly dumped

alcohol in a glass and drank it to calm himself.  Counsel thought if it were presented as

though Petitioner knew the exact amount, "there's no way the jury would buy it," that the

jury would see it as "absurd," and it "really was tilting at windmills."  *Id.*, pp. 796-797,

832.  He said:  "[I]t all boils down to whether or not they believe the defendant in the first

place.  So that's a major issue too."  *Id.*, p. 835.  In his closing argument to the jury,

Ratchford argued that Petitioner needed a vasodilator, and poured himself a tumbler of

Scotch.  Ex. C, pp. 1218-1219.  Ratchford further argued:  "Measurements,

measurements?  To heck with measurements.  People don't measure things like this

when this is going on.  He showed you on the glass, he made the mark how much he

had."  *Id.*, p. 1219.

Consequently, the ruling of the Rule 3.850 court is not contrary to or an

unreasonable application of <u>Strickland</u>, nor based on an unreasonable determination of

facts in light of the evidence presented in state court.    Petitioner is not entitled to relief

on this claim.

### Point Four

Petitioner claims that counsel was ineffective in making statements during the

course of the interview such that when the audiotape was introduced, counsel

essentially became a witness against his own client, creating a conflict of interest.  Doc.

1, p. 10.  Petitioner again points to counsel's statement in the tape that Petitioner had

several drinks that night, which was contrary to Petitioner's testimony and the position of

the defense.[16] Petitioner claims counsel should have tried to have his own comments

redacted or deleted from the tape before it was played to the jury. *Id.*

The state court did not specifically address this particular aspect of the

ineffectiveness claim in the written order denying Rule 3.850 relief. Ex. J, pp. 980-989.

Petitioner has not shown deficient prejudice under Strickland, particularly in light

of the factual finding as to counsel's strategy. At the Rule 3.850 hearing, counsel

explained why he made statements on Petitioner's behalf at the interview:

> Because of his reluctance to do this at all, I felt that if I said, look, Barton, here's the story, that it would give [Petitioner] deniability. If I had said anything wrong, he could certainly say my lawyer misunderstood me, my lawyer misinterpreted, that's not what I told him. I was giving him some deniability there. I felt that would be a much better way to approach it [than] having him say it and say something wrong.

*Id.*, p. 826.

This was completely consistent with the strategy that Petitioner would be

forthcoming and cooperative from the very beginning.[17] It also allowed Petitioner to be

cooperative yet not necessarily limited to statements by counsel later, for impeachment

---

[16] Petitioner again claims that counsel should have notified police when he learned that misstatements were made in the interview, and again refers to the "three shots" rather than "three fingers" statement in the tape. *Id.* Using the corrected "fingers" measurement, Petitioner argues his blood alcohol taken hours after the accident was explained by having had six or seven ounces of Scotch, thus supporting the defense that he was not impaired at the time of the accident. *Id.* These arguments are already addressed elsewhere.

[17] Ratchford noted the scenario in closing argument, that only days after the accident Petitioner gave a statement, "[h]e tells them everything about what was going on that night, gives it in my office. I'm sitting there. I help. I give some information, too. Officer Barton is asking questions. He's interjecting, everybody's throwing information into this little statement so the police will know what happened." Ex. C, p. 1225.

purposes.[18]  When pressed at the Rule 3.850 hearing as to whether it might have

created a conflict or appearance of conflict if what counsel said was contrary to what

Petitioner said, Ratchford replied, "[o]kay.  You're right, it was a problem, yes."  *Id.*, pp.

829-830.  Assuming this was a genuine admission by Ratchford of a problem with his

strategy (which, from his phrasing, is not at all clear), what counsel thought in hindsight

does not change the objective analysis under Strickland.  Further, pursuit of an agreed

strategy on behalf of Petitioner is, *ipso facto*, not pursuit of a conflicting interest.

**Point Five**

Petitioner claims ineffectiveness as counsel advised him to attend the interview

despite his ongoing physical and emotional problems.  Doc. 1, p. 10.  He alleges he was

heavily medicated at the time, his condition impaired his ability to aid counsel at the

interview, and "police investigators gained evidence sufficient to bring charges, which

they otherwise would not have obtained."  *Id.*, p. 11.

The state court found:

> The Defendant's claim that trial counsel was ineffective in allowing the
> Defendant to give the interview while he was under stress and not
> physically well is refuted by the very tape itself.  In reviewing the
> defendant's responses, the Defendant sounds alert and acknowledged
> that "he wanted to help."  This goes along with the strategy of avoiding
> being charged all together.  Furthermore, the interview was conducted
> days after the accident.  (EH. P. 271-273).  Trial counsel testified the
> defendant looked fatigued but was mentally sharp and not out of touch so
> as to postpone the interview.  The strategy was there was no reason to
> hide anything because the defendant was not guilty.  Trial counsel's
> decision to go forward with the interview was not ineffective.  Finally, there
> is no showing that the defendant was pressured into giving the interview

---

[18] Even Judge Ackerman, Petitioner's brother, agreed it is common for attorneys
to speak for clients to avoid any incriminating or damaging statements later being
attributed to a client.  Ex. J, p. 710.

nor was he prevented from not submitting to the interview as scheduled.
The Court finds the testimony of trial counsel more credible on this issue
than the testimony of the defendant.

Ex. J, pp. 981-982.

This is not a unreasonable determination of the facts in light of the evidence

presented, or contrary to or an unreasonable application of Strickland.  The state court

listened to the tape, heard the testimony of Petitioner and Ratchford at the evidentiary

hearing, determined that Petitioner sounded alert, and its finding that Petitioner was not

pressured to give the statement is presumed correct.  Further, the jury heard both the

tape and Petitioner's live testimony during trial, and could decide how he sounded

during the interview.  Petitioner testified that in the days following the accident, he spent

most of the time in bed, "called you [Ratchford] and told you some of the facts, and then

I called my insurance company, basically went back to bed."  Ex. C, p. 1103.  The day

of the statement, as Petitioner explained at trial:

> I was feeling terribly remorseful.  I was – I was on – I was on Xanax, which
> is sort of a modern-day version of Valium, I guess.  It's something that I
> have access to, but do not like to use because it puts me in that kind of a
> state.

Id., p. 1104.  Petitioner also explained about his prior statement during cross

examination:

> The day that that statement was given, you can clearly tell the
> circumstance of my – my emotional state and my sobriety for that matter.
> I was on Xanax for four days.  I did not even drive down to my lawyer's
> office.  I had somebody take me.  I wasn't capable of driving.

Id., p. 1142.  The jury could determine for itself Petitioner's state of mind at the time of

the interview.

**Ground Two**

Petitioner asserts ineffectiveness for counsel's failure to call Gary Peaden as an expert witness in blood alcohol analysis. Doc. 1, p. 12. Petitioner asserts that Peaden's analysis was necessary as to hypothetical numbers provided by the defense, to explain that Petitioner's blood alcohol could have been 0.16 at 4:35 a.m. if he drank Scotch afterwards. *Id.*, pp. 13-14. He asserts that Peaden would have testified that Plaintiff's blood alcohol level was no more than 0.02 at the time of the accident. *Id.*, p. 13. He contends that Peaden would have "disagreed strongly that Mr. Ackerman's BAC could result in a reading of 0.16 or higher based on the amount of alcohol he consumed at the Banana Bob's venue prior to the accident." *Id.*, p. 14. Petitioner argues that Peaden's testimony also validates the argument that counsel should have corrected what was said at the pre-arrest interview regarding the amount of Scotch consumed at home. *Id.* Petitioner claims that this left uncontested the prosecution's expert testimony of Marsha Barnard. *Id.*

Any claim that Barnard's testimony was uncontested is contradicted by the transcript. The prosecution's expert testified that if one assumed that the only alcohol Petitioner had was before the accident, that is, before 2:00 a.m., and that he did not drink any more, his blood alcohol level would have been between 0.18 and 0.22 at the time of the accident, 2:00 a.m. to still have a blood alcohol level of 0.16 at 4:35 a.m. Ex. C, pp. 407-408. To reach a level of 0.18 and 0.22 before 2:00 a.m., Petitioner would have had to consume 6 to 10 drinks. *Id.*, p. 407. She said that if one assumed that Petitioner also drank three shots of Scotch after the accident, his blood alcohol level at the time of the accident would have been between 0.10 and 0.17 based upon a level of

0.16 at 4:35 a.m. *Id.*, pp. 408-409. She said that if one assumed that Petitioner drank no alcohol before the accident, and then drank three shots of Scotch 15 minutes after the accident, by 4:35 a.m. his blood alcohol level should have been between zero and 0.06. *Id.*, pp. 409-410.

The transcripts shows that Ratchford cross-examined Barnard at length. Barnard said that she considered a "drink" to be one shot of liquor, 86 to 100 proof. *Id.*, p. 417. Ratchford asked if Barnard had any idea what size glass Petitioner was using, and whether the "shots" were measured in the glass. *Id.*, p. 418. She said she had no idea how many shots there would be if, instead of three shots, Petitioner poured three inches of Scotch into a tea glass. *Id.*, pp. 418-419. He asked about the assumptions she had made in estimating blood alcohol at the time of the accident using Widmark's formula. *Id.*, pp. 426-427. She agreed that her calculations were based on an assumption that the person had already reached the peak alcohol level (on an alcohol curve, when absorption and elimination are equal) and was on the elimination part of the curve. *Id.*, pp. 427-431, 443-444. She conceded that she did not know when Petitioner's alcohol level peaked, and without knowing the time of peak, extrapolation is not valid. *Id.*, pp. 431-432. Counsel asked her to calculate whether Petitioner's blood alcohol level would have been around 0.16 at the time of his blood test if he had not had any alcohol earlier and drank seven ounces of Scotch around 2:15 a.m. *Id.*, p. 432. She said that calculation would take a significant amount of time, and did not do the calculation. *Id.*, p. 433. She said in this case she was assuming that all alcohol had been absorbed by 2:00 a.m., and agreed that a person could go from zero blood alcohol at 2:00 a.m. to 0.16 at 4:35 a.m., but it would take many shots of alcohol, certainly more than three

shots. *Id.*, p. 442. She did not know how big a swallow of liquid Petitioner or anyone could take in one gulp. *Id.*, pp. 442-443. She did not know whether blood thinners or antibiotics might change the assumptions in testing, and agreed that high metabolism or blood pressure due to stress could change the speed of absorption of alcohol. *Id.*, p. 445-446.

Counsel testified at the Rule 3.850 hearing that he used Peaden as a witness for the defense only a few times, on very rare occasions. Ex. J, p. 800. He said he could get the answers he needed to cast doubt on tests from the prosecution's own witnesses, "and, therefore, when people would ask me, what expert do you use in your DUI cases, Ratchford? My answer was that I use the State's own – I use the expert they bring. I don't need anybody else." *Id.*, p. 801. He explained that everyone uses the same science of alcohol and "the answers are going to be the same regardless of whether you're dealing with Tom, Dick, or Harry." *Id.*, p. 802. He did not think Peaden could give anything beyond what he could elicit from the State's expert (Barnard), and thought Peaden could potentially be damaging. *Id.*, p. 802. He said Peaden is a law enforcement officer, thinks that the breath machine "is the greatest thing invented," and "one thing about Gary Peaden is he is as honest as the day is long and there were some questions that you could have asked him on the witness stand that his honest answers could have certainly hurt us." *Id.*, pp. 802-803.

The state court found:

Trial counsel testified at the evidentiary hearing that he did not call Peaden because he could get the same testimony from the State's own expert that when it comes to toxicology the "formula" used to calculate blood alcohol level is the same and the only variance is due to the numbers inputted into the equation. (EH. 280). This Court finds that trial

> counsel's actions not to call Peaden was a reasonable strategic decision
> that does not amount to ineffective conduct.

Ex. J, p. 984.

This is not contrary to or an unreasonable application of <u>Strickland</u>, or based on an unreasonable determination of the facts in light of the evidence presented. Neither Barnard nor Peaden could remake the evidence. Peaden's opinion would have been helpful to Petitioner only if the jury had concluded that he had had little or no alcohol before the accident, and then drank the right amount of Scotch to spike his alcohol level to 0.16 by 4:35 a.m. Petitioner's counsel fully explored that possibility with Barnard, but the jury did not so find. Ground two affords no relief.

### Ground Three

Petitioner next asserts ineffective assistance of counsel for failing to call Brandon Nelms to testify for the defense. *Id.*, p. 15. Nelms was driving the car in which Ronald Gee was a passenger, and was in the same area shortly before the accident. Gee testified at trial and Nelms did not. Gee testified that he hollered at a person in the road and then Nelms swerved the car to avoid hitting that person. Petitioner claims that Nelms could have testified that he did not see the person, and might have hit him if Gee had not yelled out. Doc. 1, p. 15.

Nelms was interviewed in October of 1997, before trial. Ex. J, pp. 479-487. Nelms was apparently a minor, as his mother also gave consent for his statement to be recorded.[19] Nelms said in that pretrial interview that on the morning of June 7, 1997, *he*

---

[19] At the time of the Rule 3.850 hearing in April of 2003, Nelms was 23 years old. Ex. J, p. 621.

*saw a man walking in the street*, not in the middle but on the side of the street, inside the white line along the curb. *Id.*, pp. 479-482 (emphasis added). He said that when they went by (implying that he saw the victim before they reached him), his friend said "[b]uddy get out of the street before you get hit by a car," and then they drove up to a gas station. *Id.*, p. 480. Only minutes later someone came up and said a man was hit by a car, so Nelms went back and saw the man laying in a pool of blood, dead in the street. *Id.* Asked the condition of the man or if he was staggering, Nelms said:

> I couldn't tell cuz it was, I was on my way home. It was late. I couldn't tell.
> We're flying down the street. I just knew it was a man walking the street
> because I almost hit him myself, that is why [Gee] say get out the street
> you know. I couldn't I couldn't tell if he was drunk or what but . . .

*Id.* He said he knew which side of the street "[c]uz it was the right of my car, he was right there." *Id.*, p. 481. Asked "but you couldn't tell [if] this fellow was staggering or walking or . . . " he said, "[n]o I could tell." *Id.*, p. 482. He did not elaborate further. Asked if he had to swerve to avoid hitting the person, Nelms said "[n]o." *Id.* He said "I just came kinda close to him cuz I was on the outside lane right by the curb and like like [sic] he was walking on the inside of the white line," meaning the line in the street along the curb. *Id.* Nelms said he did not have any difficulty seeing that night. *Id.*, p. 484.[20]

---

[20] Ronald Faria was driving back from the beach with two friends and discovered the body. He left his friends there and went to the gas station while Nelms and Gee were still there. Ex. C, pp. 289-297. He went from there to a convenience store to find a police officer, who followed him in a police car back to the body. *Id.*, pp. 296-297. Faria said when he first saw the body he had to swerve to miss it, and saw it in his headlights; he saw the body "plain as day" even before the headlights were on it. *Id.*, pp. 298-299. When pressed, he could not say if he saw the body before or after his headlights were on it, "it happened so fast. I couldn't say if I did or not. I seen him." *Id.*, p. 299. Faria was going about 50 miles an hour and saw the man on the ground in time to avoid hitting him. *Id.*, p. 300.

At the Rule 3.850 hearing, Nelms said that he did not see the man until Gee

hollered at him.  Ex. J, p. 623.  He said that when Gee yelled at the victim, the victim

was already at Nelms's fender or passenger door.  *Id.*  Ratchford testified that he did not

call Nelms because he did not add anything to the defense that was not already

provided by Gee.  *Id.*, p. 815.  Since Gee said the car swerved after he yelled, counsel

thought:

> [T]hat [Nelms did not see the man] was a logical deduction and an
> inescapable deduction that there's no way that Nelms could have seen
> him.  If he would have seen him, Nelms would have been swerving before
> the passenger ever said a word.  And the problem was I was afraid that if I
> put Nelms on the witness stand, that he might have said he did see him
> before that and that would have hurt us.

*Id.*, pp. 815-816.  He said he "absolutely" got what he needed from Gee's testimony.  *Id.*

This is supported by his closing argument at trial.  *See* Ex. C, pp. 1199-1200.[21]

The state court rejected this ineffectiveness claim:

> Trial counsel testified at the hearing that Nelms couldn't add anything new
> by testifying and he was worried Nelms might actually testify that he saw
> the victim.  (EH. 293)  Such testimony would have been very damaging to
> the defense theory that the victim caused the accident and that there was
> nothing the Defendant could have done to avoid hitting him.  The assertion
> that trial counsel erred by not calling Nelms is without merit.

Ex. J, p. 985.

Petitioner has not shown this was contrary to or an unreasonable application of

Strickland, or based on an unreasonable determination of facts in light of the evidence

---

[21] Counsel argued that "if it hadn't been for Ronald Gee seeing him and yelling,
somebody else might be here today."  *Id.*, p. 1200.  He noted a passenger could see
something that a driver might not, a passenger is just sitting there with his field of vision
on the right hand side of the road.  *Id.*  "Ken Ackerman didn't have a passenger that
night.  If Ken Ackerman had had a passenger that night, maybe we wouldn't be here,
because Chad would still be alive."  *Id.*

presented. Ineffectiveness is judged from the perspective of what counsel knew at trial. In the statement shortly before trial (and obviously closer in time to the accident than was the Rule 3.850 hearing), Nelms implied that he saw the victim in the street before Gee yelled and before they reached him. Nelms also said he did not have difficultly seeing that night, and said that he did *not* have to swerve to avoid hitting the man. Gee's testimony that Nelms swerved after he yelled out was stronger on its own without these expected qualifications from Nelms. Ground three is without merit.

**Ground Four**

Petitioner claims counsel was ineffective for failing "to adequately investigate and prepare defense witness Charles Stallworth to testify, which resulted in prejudice to the defense." Doc. 1, p. 16. Stallworth was the last person to see and speak with Petitioner just minutes before impact. He testified that Petitioner did not seem impaired in any way, and he was only a few feet away from Petitioner and did not smell alcohol. *Id.* Petitioner claims that "[d]uring cross-examination the Prosecutor descended upon Mr. Stallworth's criminal history with a vengeance," and that it was due to counsel's failure to prepare him that "Stallworth became argumentative and defensive" on the stand. *Id.* Petitioner claims that counsel failed to discover Stallworth's criminal background or the fact that Petitioner's brother, Judge Ackerman, presided over one of the cases in which Stallworth entered a guilty plea. Petitioner claims this created an impression of pressure or influence to testify for the defense, and counsel should "have defused this situation and reduced any potential damage these situations were prone to cause." *Id.*, p. 17. Petitioner asserts that:

the trial court's order centers on counsel's inadequately preparing Mr. Stallworth as a witness to testify and refreshing his memory as "whether or not one or two sandwiches were consumed."  First, Petitioner never consumed any sandwiches at the Subway, and the issue of counsel failing to conduct an adequate investigation and thereby not discovering Mr. Stallworth's criminal history is not addressed at all.

*Id.*  Petitioner argues, therefore, that this court must hold an evidentiary hearing.  *Id.*

Stallworth worked at a Subway, and said Petitioner was a customer there maybe two or three times every other week.  Ex. C, pp. 975-976.  He said Petitioner usually got a six inch chicken sandwich, and that night he bought a foot long chicken sandwich, which was the same as two six inch sandwiches.  *Id.*, p. 977.  He remembered Petitioner buying three cookies but not chips.  *Id.*  Stallworth said there was nothing at all different or strange about Petitioner from any other night he had come in, that Petitioner asked him a follow up question to something they had talked about two or three weeks before.  *Id.*, pp. 977-979.  When Petitioner paid for his order, he was standing only two or two and a half feet away from Stallworth, and Stallworth said he did not smell alcohol.  *Id.*, pp. 980-981.  Stallworth worked late, and working late hours he had to deal with people who were drinking, and he could smell alcohol on them.  *Id.*, pp. 981-982.  He did not see Petitioner stumble, stagger, or  walk with any uncertainty, or have trouble standing at the counter or taking out his money to pay.  *Id.*, pp. 982-983. He did not notice any difference in speech, difficulty with words, confusion, or disorientation.  *Id.*, p. 983.  Stallworth noticed Petitioner grabbing at his chest, so he offered him some water, and Petitioner drank it and tossed it in the garbage can without any difficulty.  *Id.*, pp. 984-985.

On cross examination, Stallworth said that Petitioner was a regular night customer, and said he knew now but did not know then that he was a lawyer or that his brother was a judge. *Id.*, p. 987. He felt if Petitioner had been drinking he would have smelled it by being that close to him. *Id.*, pp. 988, 989. Stallworth was asked if he had prior convictions, and he said over four years before, when he was 19, he appeared before Judge Ackerman on worthless check charges. *Id.*, pp. 989-992. Stallworth was trying to defend his prior convictions by explaining what happened. *Id.*

In denying this ineffectiveness claim, the state court found:

> The Defendant suggests that trial counsel should have "refreshed" Mr. Stallworth's memory so that he could testify that the Defendant purchased two sandwiches prior to the accident instead of one as Stallworth testified at trial. Additionally, the Defendant argues that because trial counsel did not adequately prepare Mr. Stallworth, he was argumentative with the prosecutor when the witness's prior convictions were brought up. Such actions do not constitute ineffective conduct and even if the actions of trial counsel were deficient, this Court finds that the second prong of the Strickland test has not been met. Whether or not one or two sandwiches were consumed and the demeanor of Mr. Stallworth are not issues that prejudiced the Defendant's case.

Ex. J, p. 986.

The state court's adjudication of this claim is not contrary to or an unreasonable application of <u>Strickland</u>, or based on an unreasonable determination of facts in light of evidence presented.[22] Stallworth was obviously an important (if not the most important) witness for the defense, since he saw Petitioner just minutes before the accident and

---

[22] The state court's mention of Stallworth's demeanor as not prejudicing the defense is contrary to Petitioner's assertion here, that the court focused only on the sandwiches and did not address counsel's failure to prepare Stallworth.

did not notice any impairment or smell alcohol.[23]  While it is true that Stallworth could

have been coached to admit his prior convictions without argument, it is doubtful that

the fact that he tried to explain what happened had any effect upon his credibility as to

what he saw the night that Petitioner came into the Subway.  The jury would have seen

his explanations as something that most people would do when required to admit

publically to having been convicted of felonies.  In any event, no amount of preparation

would have made the convictions go away.  That Petitioner's brother was the judge

assigned to Stallworth's case years before could as easily be seen by the jury as

something which might predispose him to testify *less* favorably for Petitioner.  Relief on

this claim should be denied.

### Ground Five

Petitioner faults counsel for failing to question and challenge potential jurors who

did not drink alcohol ("teetotalers"), resulting in "teetotalers" serving on the jury and

deciding the case.  *Id.*, p. 17.  Petitioner claims counsel should have challenged them

for cause, or used available peremptory challenges to strike them.  Petitioner contends

that counsel's examination of these jurors regarding their reasons for abstinence from

alcohol was minimal, and two of them, Knie and Llewalyn, were not questioned at all.

*Id.*, p. 18.

---

[23] Ratchford testified that "the most important witness out of all of them on the question of Mr. Ackerman's condition at the time of the accident was the guy that worked at the submarine shop, he was the key witness.  He's the last one to see him within five minutes of impact, that was the strongest and most important."  Ex. J, pp. 819-811.

Petitioner asserts that during jury selection, he discussed with counsel his concern about the prospective jurors, but Ratchford told him that one "juror['s] husband was a minor league baseball player, so she's probably going to be okay." *Id.* (citation to the record omitted). In general, states Petitioner, "[c]ounsel believed that a non-drinker juror would even benefit Petitioner's case because of the level of intoxicants present in Mr. Cowan at the time of the accident, which could far outweigh any prejudicial attitude they had towards Petitioner using alcohol." *Id.* As there was evidence that Petitioner had used alcohol for some 30 years, and was a frequent customer at three local bars, and the defense was that he did consume alcohol after the accident, Petitioner claims that reasonable counsel would have sought jurors without this alleged inherent bias against alcohol. *Id.*

Counsel testified at the Rule 3.850 hearing that the fact that a juror does not use alcohol is not a basis for a challenge for cause. Ex. J, p. 806. He explained that people do not drink for medical reasons, dislike of the taste, because alcoholism destroyed their families, and due to moral and religious beliefs. *Id.* He said that "there's always the problem that you're going to get some nondrinker who has a moral attitude, that thinks that everyone who uses alcohol is evil, doomed to perdition," and he said you try to address that in voir dire. *Id.* But Ratchford said that he had something different in this case, a victim who was using illegal drugs, was a drug addict, and had 11 different controlled substances, including alcohol, in his system that night. *Id.*, p. 807. Ratchford reasoned:

> So my feeling as far as it was having nondrinkers on the jury, I felt that any attitude they had about the use of intoxicants that may be prejudicial to the defendant, would be far out balanced and outweighed by [a] prejudicial

> attitude towards the victim and his use of illegal substances in quantities
> far greater than anything Ken Ackerman had done.

*Id.*, p. 807. there are various reasons people do not drink alcohol, and how that might affect them as jurors; he said that this was an unusual case as the victim had used drugs. Ex. J, pp. 806-807. He said there was nothing illegal about Petitioner drinking (unless he was driving while impaired, but the defense was that he was not). *Id.* He reasoned that jury selection was conducted differently in this case (from other cases he had tried) voir dire questions were addressed only to those called to the box, not to the entire panel, so he thought that there was no way to know beforehand whether other potential jurors did or did not drink alcohol. *Id.*, pp. 808-809. He said: "And also I felt I had established a rapport with the ones that we had questioned." *Id.*, p. 809. Asked if he seriously thought the jury would "be prejudiced against a dead man," Ratchford responded: "[n]ot necessarily prejudiced against the dead man, *but certainly sympathetic to the one that's alive that didn't have anything to do with it.*" *Id.*, p. 848 (emphasis added). He said "[t]he accident, my position was Chad Cowen caused his own death. I still believe that today." *Id.*

The state court rejected this claim of ineffectiveness, reasoning:

> Trial counsel testified that the defense strategy was not a typical DUI
> defense, but rather that the victim's use of drugs and alcohol was the sole
> cause of the accident i.e., the victim was so drunk he fell into the path of
> the defendant's vehicle. Trial counsel testified he had a victim with 11
> different substances in his body and was using illegal drugs. (EH. p. 285-
> 286). He felt any attitude they had concerning use of drugs/alcohol would
> go to the victim who was using much more than the defendant. Due to the
> nature of the defense strategy trial counsel's allowing temperate jurors on
> the panel could have been beneficial to the defense if the jurors focused
> on the victim's behavior prior to the accident. The Court also notes the
> defendant's testimony at the 3.850 hearing concerning the striking of three
> (3) jurors. The defendant testified his attorney told him it was the

defendant's call but the attorney felt "we" should leave them. The defendant testified he felt "reluctant" to assert himself over his attorney's "objection." From this testimony, it is evident the defendant was consulted about the jury makeup and was properly given the opportunity by trial counsel to "make the call" as to whether the three (3) jurors remained on the panel. (EH. p. 233). There is nothing in the record to substantiate the defendant's claim that his attorney "objected" to his concern to a degree so as to keep the defendant from exercising his right to strike the three (3) jurors if he truly wished to do so. This Court finds that trial counsel's strategy was competent and his actions do not constitute ineffective conduct.

Ex. J, p. 983.

This is not an contrary to or an unreasonable application of Strickland, or based on an unreasonable determination of facts in light of evidence presented. Counsel made a strategic decision, a decision consistent with Petitioner's claim that he discussed it with counsel at the time of jury selection. To accept a "teetotaler" juror as possibly more beneficial to the defense on the facts of this case was the strategy of an experienced trial attorney who specialized in DUI defense.[24] As reasonably explained by the Rule 3.850 court, the defense was to focus upon the drug abuse of the victim. Strickland cautioned that "representation is an art;" a characterization which is particularly well suited to the nuances of selecting a jury. This ground is without merit.

**Ground Six**

Petitioner asserts ineffectiveness in the process of jury selection with regard to an exchange with potential juror Roberts as to pretrial publicity. Doc. 1, p. 19. Roberts

---

[24] Petitioner assumes that people who do not drink are inherently biased against a defendant in a DUI case. But people who drink alcohol would not necessarily be more beneficial. For example, a person who regularly consumes alcohol might be less inclined than someone who does not to believe that Petitioner, who has been drinking for 30 years and regularly frequents three local bars, was in two different bars on a Friday night, over a span of some seven hours, drinking mostly water.

said that, according to the media, Petitioner had already been convicted, and agreed

that he probably carried that with him and this probably caused him to be biased about

the case.  *Id.*  Petitioner asserts that counsel at that point should have requested a

curative instruction or moved to strike the entire jury panel, as tainted by this exchange.

Respondent asserts that this claim was presented in the Rule 3.850 motion[25] but

not mentioned at all in Petitioner's appeal from denial of Rule 3.850 relief, and is

therefore procedurally defaulted.  Doc. 17, p. 7.  Petitioner replies that all ineffective

assistance of counsel claims were raised in state court as federal constitutional claims,

and therefore properly exhausted.  Doc. 33, pp. 2-4.  He "concedes that [grounds six

and eight] were not specifically briefed in the state appeal of the denial of Mr.

Ackerman's post-conviction motion, albeit they are referenced factually."  *Id.*, p. 4.

Petitioner does not cite any specific pages of the brief for this factual reference.

The question is not whether Petitioner raised ineffective assistance of counsel as

a constitutional claim (which he did), but whether he fully exhausted this particular

ineffective assistance of counsel claim as to potential juror Roberts and the pretrial

publicity.  As conceded, this claim was not listed as a basis for appeal.  *See* Ex. K, pp. i-

---

[25] Respondent acknowledges that all ineffective assistance of counsel claims were presented to the state court, citing Ex. J.  Doc. 17, p. 7.  Ex. J includes the entire Record on Appeal in the Rule 3.850 proceedings, well over 1000 pages.  The Rule 3.850 motion, including exhibits, is at pp. 362-425 of Ex. J.  There Petitioner argued ineffectiveness as to Roberts' statement, claiming counsel should have requested a curative instruction or asked to replace all prospective jurors who had heard and were tainted by the remark.  *Id.*, p. 382.  He also argued error of the trial court, in light of the media coverage, in failing to adopt a process to keep untainted prospective jurors from being exposed to opinions of those already tainted by the media, to give a cautionary instruction, or to excuse the panel after they were exposed to Roberts.  *Id.*, p. 404.

ii (table of contents, listing issues). I can find no mention in the appellate brief of juror Roberts, or this exchange, or to any jury selection problem involving pretrial publicity.

On appeal from denial of a post conviction motion in Florida, the movant must raise the particular claims and present arguments to support the points on appeal in his brief. *See* Sweet v. State, 810 So. 2d 854, 870 (Fla. 2002) ("because on appeal Sweet simply recites these [additional ineffectiveness] claims from his postconviction motion in a sentence or two, without elaboration or explanation, we conclude that these instances of alleged ineffectiveness are not preserved for appellate review."), *citing* Shere v. State, 742 So. 2d 215, 217 n. 6 (Fla. 1999) (heading in the brief asserting that trial court erred in summarily denying 19 of 23 claims raised in the Rule 3.850 motion, where no argument was made as to the grounds of error, was insufficient and claims were deemed abandoned) (citation omitted); *and* Duest v. Dugger, 555 So.2d 849, 851-52 (Fla.1990) (reference to arguments raised in post conviction motion was insufficient; "[t]he purpose of an appellate brief is to present arguments in support of the points on appeal. Merely making reference to arguments below without further elucidation does not suffice to preserve issues," so they were deemed waived). *See also,* Hannon v. Dep't of Corr., 622 F.Supp.2d 1169, 1200 (M.D. Fla. 2007) (citing Sweet and Duest, finding ineffective assistance of counsel claims which had not been raised in postconviction appellate brief were procedurally barred from § 2254 habeas corpus review; there was no showing of cause or prejudice, or fundamental miscarriage of justice) (other citation omitted).

Petitioner here failed to present this claim in the Rule 3.850 appeal and is now procedurally barred from raising it. He has not demonstrated cause or prejudice for his default, and this court need not reach the merits.

Regardless of the default, Petitioner is not entitled to relief because the state trial court's adjudication was reasonable. § 2254(d). Roberts said he knew or was related to someone who had been charged with DUI, and thought the person was treated fairly, and this did not cause him any adverse feelings toward law enforcement. Ex. C, pp. 44-45. He said he would try to be fair and impartial to both sides, and when the prosecutor commented that he sounded "a little bit hesitant," Roberts made the comments (now at issue) about exposure to media coverage of the case. *Id.*, pp. 45-46. Following the comment, there were questions and answers between Ratchford and prospective jurors to determine their ability to put such things aside, to decide the case only on the evidence, and to start with a presumption of innocence. *See* Ex. C, pp. 44-47, 59-69.

The trial court rejected the ineffectiveness claim:

> The trial court had already instructed the jury panel on the presumption of innocence (T. 38-39) and in response to Roberts['s] concerns, trial counsel reiterated the presumption of innocence and the importance of being able to place aside what they might have heard in the media and base their opinion solely on the evidence presented at trial. (T. 59-61). While some attorney[]s may have moved to strike the jury panel after Robert[s's] concerns trial counsel here took the opportunity to talk to the jury panel about the importance of setting aside any preconceived notions. Such actions do not amount to ineffective conduct.

Ex. J, p. 984. This was not contrary to or an unreasonable application of <u>Strickland</u>, or based on an unreasonable determination of the facts in light of the evidence presented. Petitioner would not be entitled to relief on this claim even if the claim were not procedurally defaulted.

**Ground Seven**

Petitioner asserts ineffective assistance of counsel for telling the jury during

opening argument that there would be medical testimony on the effect of high blood

pressure on an aneurism, and then failing to produce such evidence during the trial.

Doc. 1, p. 20.[26]  Petitioner claims that counsel made a promise to the jury that he failed

to keep, thus compromising and undermining Petitioner's credibility with the jury.  *Id.*  He

claims "[c]ounsel knew, or should have known that no such expert witness was lined up

to testify.  Counsel also failed to bring forth such testimony from the State's experts."  *Id.*

Petitioner asserts that counsel should have presented this testimony or alternatively,

never have indicated that it would be presented.  *Id.*, pp. 20-21.

Respondent notes that this claim was raised in the Rule 3.850 motion, but not

mentioned in the appeal.  Doc. 17, p. 7.  Petitioner responds that it was argued on

appeal as issue II(D).  Doc. 33, p. 4.

In the Rule 3.850 motion, Petitioner claimed that counsel was ineffective for

failing to call at least two medical doctors who had treated Petitioner.  Ex. J, pp. 372.

The doctors were not named in the motion itself, which said that "letters from those two

doctors are attached and incorporated hereinto as Exhibits '2' and '3'."  *Id.*, p. 372.  The

---

[26] Counsel said in opening that Petitioner was not a healthy man, that he had
surgery on his hip, that he suffered heart conditions, had open heart surgery, had an
aneurism, and takes blood thinners.  Ex. C, pp.191-192.  He said once Petitioner was
home and saw his car, that "his blood pressure and his heart went crazy," that his heart
was "practically jumping through his chest."  *Id.*, pp. 192-193.  He said Petitioner knew
that if he took nitroglycerin it would make him sleep, and he made a choice to drink
something to calm himself.  *Id.*, p. 193.  He then said "[w]e're going to get some medical
testimony about the effect of high blood pressure upon an aneurysm, and I anticipate
that evidence is going to tell you, if you have got an aneurysm and you can't control
your blood pressure, you will die."  *Id.*

attached letters were written by Drs. Doty and Kennish. *Id.*, pp. 421-422 (Doty) and 423 (Kennish).[27]  Petitioner alleged that the doctors' testimony would have refuted the prosecution theory that Petitioner was able to dance without difficulty throughout the evening, and would have shown that his inability to perform field sobriety tests must have been due to impairment. *Id.*, p. 372.  He alleged that the doctors' testimony would have substantiated and supported the defense theory that Petitioner was not well, experiencing intestinal difficulties, and that when he saw the damage to his car, he drank Scotch in an attempt to lower his blood pressure. *Id.*  He claims medical testimony would have refuted the "theory of impairment and avoidance-of-detection," advanced by the prosecution. *Id.*, p. 372.

Elsewhere in the Rule 3.850 motion, Petitioner asserted ineffectiveness of counsel in making a promise in opening argument that there would be testimony about the effect of high blood pressure on an aneurysm, when counsel knew or should have known he did not have medical experts lined up to so testify.  He claimed counsel should not have made a promise he could not keep, and should have either presented the testimony or not indicated its availability to the jury. *Id.*, pp. 385-386.  Petitioner did not mention the doctors by name or reference the exhibits in this portion of the motion. At the evidentiary hearing Petitioner presented Dr. Doty as a witness. *See* Ex. K, p. 7-8 (summarizing evidence presented at the evidentiary hearing).

---

[27] In their unsworn letters, both Doty and Kennish said that Petitioner had an increased risk of rupturing his aortic aneurysm if his blood pressure was high, or was under stress which could cause a rise in blood pressure.  Ex. J, pp. 421-423.

The trial court addressed the argument that counsel was ineffective in failing to call Doty, but did not address the argument that counsel was ineffective for making a promise to the jury he did not keep (and should have kept it or alternatively, not made it) as to medical testimony. These are different claims. The claim asserted on appeal (issue II(D)[28]) was the former, and the claim raised as ground seven in the § 2254 petition is the latter. As the trial court did not address the current claim in its written order, Petitioner had to articulate the basis for his claim on appeal. It therefore appears that the claim raised here as ground seven was not fully exhausted and is procedurally barred in state court. Petitioner has not alleged cause or prejudice for his default.

To the extent that Petitioner is trying here to raise the claim addressed by the state court and exhausted on appeal, given his reference to the other claim in the appellate brief, he has not shown that adjudication of the claim was contrary to or an unreasonable application of Strickland, or based on an unreasonable determination of the facts in light of the evidence presented. The state court found:

> The Defendant asserts that Dr. [Doty] would have testified that the Defendant could have lowered his blood pressure by consuming alcoholic beverages. However, Dr. [Doty] stated at the evidentiary hearing that [he] had never prescribed alcohol for the Defendant as a means to reduce his

---

[28] In the outline of the arguments set forth in the amended initial brief, Section II(D) was "Failure to Elicit Medical Testimony From Mr. Dan Doty Constituted ineffectiveness." Ex. K, p. ii. Petitioner argued that Dr. Doty should have been presented as a defense witness to testify "that Mr. Ackerman's consumption of alcohol after the accident would not have been unreasonable given his ongoing medical condition," and that Petitioner believed Doty would be called based on the reference to medical testimony in counsel's opening statement. *Id.*, p. 59. He argued that Doty was available at the time of trial, and his "testimony would have given greater veracity to Mr. Ackerman's explanation as to why he drank the liquor after the accident, which would have contrasted the possible implausibility of that fact standing alone." *Id.*, p. 60.

blood pressure. (EH. 94-95). Trial counsel's decision not to call Dr. [Doty], or have an expert testify as to the possible benefits of alcohol consumption relating to blood pressure was a sound strategic decision when faced with the fact that he would be subject to cross-examination that would have shown that he never talked to the Defendant or encouraged him to take such actions.

Ex. J, p. 984.[29]

Dr. Doty testified at the Rule 3.850 hearing. He was Petitioner's cardiologist, knew his medical history very well, and said about 20 years previously Petitioner had undergone emergency surgery for "a sudden catastrophic illness with a dissecting aortic aneurism." Ex. J, pp. 604-605. He said Petitioner had hypertension (high blood pressure), which was a big problem with an aneurism. *Id.*, pp. 606-608, 610-611. He said over the years Petitioner was on chronic oral medication for his blood pressure, and had other quick acting drugs on hand such as nitroglycerin. *Id.*, pp. 609-610. He said Petitioner seemed to have a clear understanding of his condition and was meticulous in taking care of himself. *Id.*, pp. 608-610.

Given the hypothetical of Petitioner being faced with the high stress situation (discovering the damage to his car and what that might mean), Petitioner's perception that his blood pressure was rising, and prior problems with side effects from nitroglycerin, Dr. Doty was asked whether Petitioner might think that drinking would lower his blood pressure. *Id.*, pp. 612-614. Dr. Doty said: "I think the answer to that would be, yes, possibly." *Id.*, pp. 612-614. The doctor did not think alcohol would directly reduce blood pressure, but "if hypothetically the blood pressure is related to

---

[29] The state court used the spelling Dotty rather than Doty (the spelling used elsewhere in the record) for the doctor's name.

stress and alcohol reduces the stress, then secondarily it could reduce blood pressure," and the result would be quick. *Id.*, pp. 615-616. He had never prescribed alcohol to Petitioner for this purpose, however, or had any other discussions about alcohol with him. *Id.*, pp. 616-617.

That alcohol could be used to lower blood pressure was brought out through other medical testimony, however. Dr. Bertram testified for the prosecution regarding the autopsy of Chad Cowen. During cross examination, Ratchford asked him to define the term vasodilator, and Bertram said it was something which would cause the veins or vessels to get larger. Ex. C, pp. 615-616. When the State objected to this as beyond the scope of direct examination, counsel said he would call the doctor as a witness. *Id.*, 616. It was then agreed that Bertram could be questioned as a defense witness out of order. *Id.* Bertram said a common vasodilator is nitroglycerin, which dilates the vessels and brings down blood pressure. *Id.*, p. 617. He agreed that alcohol is a vasodilator, and could "certainly" cause a decrease in blood pressure. *Id.*

Dr. Doty's testimony that alcohol could possibly or hypothetically reduce blood pressure if it reduced stress and blood pressure was related to stress would have been no more helpful to the defense than Dr. Bertram's testimony that alcohol is a vasodilator and could "certainly" decrease blood pressure. Moreover, since Petitioner and Dr. Doty had never actually discussed the use of alcohol as a possible remedy for blood pressure, Dr. Doty's testimony on this point was potentially damaging.

The problem here was not whether Petitioner had medical problems or could have, in a moment of crisis, thought that alcohol would help his blood pressure. The problem was whether the jury would believe Petitioner that he was not impaired at the

time of the accident and did not know he had hit someone. Mr. Ratchford believed

Petitioner and thought the jury could, too, but was also "afraid the jury might not believe

a word he had to say." *See* Ex. J, pp. 835-837. Counsel was not in error in failing to

produce additional testimony on collateral issues, which may or may not have made

Petitioner any more believable to the jury.

**Ground Eight**

Petitioner claims ineffectiveness for failing to object to statements made by the

prosecutor in closing argument. Specifically, Petitioner asserts that inflammatory and

"send a message by your verdict" comments were made without defense counsel

objecting or moving for a curative instruction or mistrial. Doc. 1, p. 21.[30] Petitioner

claims prejudice because with an objection there would have been a curative instruction

or mistrial, or a potentially reversible error would have been preserved for appeal. *Id.*,

pp. 21-22.

Respondent concedes that this ground was raised in the Rule 3.850 motion,[31] but

argues it was procedurally defaulted when it was not even mentioned in the brief on

appeal from denial of the Rule 3.850 motion. Doc. 17, p. 7. Petitioner replies that while

it was not specifically briefed, it was (as with ground six) "referenced factually." Doc.

---

[30] Specifically, Petitioner takes issue with the prosecutor's assertion that for
Petitioner on that night, "it wouldn't make any difference what or who it was out there at
that intersection. It would make no difference if it were a mother and a child crossing
that street, a young adult like Chad Cowen, a senior citizen, or a disabled person." *Id.*
He challenges the argument that "[y]ou drive under the influence, [it's] careless, the law
makes you accountable for it." Finally, he challenges the argument that finding
Petitioner not guilty "would be a travesty of justice, because by doing that you will be
saying that the impaired, the disabled, the elderly, are fair game." *Id.*

[31] *See* Ex. J, pp. 398-399 (Rule 3.850 motion).

33, p. 4 . A page number is not provided. No claim was raised in the brief regarding the

failure to challenge prosecutorial misconduct in closing argument. Ex. K, pp. i-iii (table

of contents), pp. 1-33 (statement of case and summary of argument).[32]  Particularly

where the trial court addressed many individual claims, and not this one, in its the

written order denying relief,[33] Petitioner should have articulated the basis for any

appellate review.   This court should not reach the merits of this procedurally defaulted

claim.

---

[32] In summarizing the evidence produced at the Rule 3.850 hearing, the brief
referenced the testimony of Attorney Owens regarding Ratchford's performance in this
case. Part of this summary was that "[h]e also agreed that an objection should have
been asserted by Mr. Ratchford when the State referenced, in closing argument, that
Mr. Ackerman would have hit whoever was in the street: elderly, disabled, etc." Ex. K,
p. 10 (reference to the record omitted). Merely including this testimony in a laundry list
of evidence presented at the evidentiary hearing is a far cry from arguing reversible trial
error for the trial court's rejection of the ineffectiveness claim based on counsel's failure
to object to the prosecutor's statements in closing argument.

[33] The court specifically addressed, for example, the claim that counsel was
ineffective for failing to object to the prosecution's opening remark anticipating the
evidence from Petitioner would be that he was not responsible for the accident. Ex. J,
p. 986. Also addressed was the claim that counsel should have objected to (and
requested a curative instruction following) something the prosecutor said during cross
examination of Officer Ply. *Id.*, p. 987.

**Ground Nine**

Petitioner next faults counsel for his failure to object to evidence of behavioral tolerance to alcohol, or to call an expert to rebut this evidence.  Doc. 1, p. 22.  Petitioner asserts that instead of objecting, counsel actually accentuated this evidence from the state, by "elicit[ing] (risky) and inappropriate concessions, giving imminent support to the State's immaterial suggestions and evidence."  *Id.*  Petitioner asserts that there should not have been an historical analysis of his alcohol use, that "[t]he sole issue was instead the consumption of alcohol on the evening in question, prior to the accident.  And counsel should have done everything in his power to proscribe the evidence and statements made about any other time or events."  *Id.*  He claims that "[t]he prejudice to Petitioner in view of his truthful responses, which Petitioner could not have withheld in the presence of the jury was material in that it aided the State's theory of the case," and if this evidence was excluded "the jury would not have been focused on the perception of Petitioner as [an] habitual drinker."  *Id.*, p. 23.

Respondent argues that this claim was presented in the Rule 3.850 motion,[34] but not properly presented in the Rule 3.850 appeal as it was "set out in one paragraph."  Doc. 17, p. 7.  It is argued that the allegations were conclusory, and the brief did not cite cases showing any basis on which an objection would have been sustained.  *Id.*, pp. 7-

---

[34] It was argued in the Rule 3.850 motion that counsel should have secured an order in limine to prevent behavioral tolerance evidence absent laying a factual foundation for the evidence, and that at trial this evidence was presented without the proper foundation.  Ex. J, pp. 374-375, 384, 386.  He asserted it was only of conditional relevance, citing Ehrhardt on Evidence, § 105.2.  *Id.*, p. 375.

9.  Respondent also asserts that "perfunctory statements do not create issues for the appellate court to address," and are deemed inadequate to allow review.  *Id.*, pp. 9-10.

Petitioner replies that the issue was specifically raised in the brief as issue III(C). Doc. 33, pp. 4-5.  The issue was listed as a grounds for relief, and addressed in the brief.  Ex. K, pp. Ii, 65-66.  Given the page limitation for the brief, which had already been expanded on his request, Petitioner claims this argument was adequate.  Doc. 33, p. 5.

The state trial court rejected this ineffectiveness claim:

> Such evidence was used to establish that the Defendant had a long history of consuming such drinks and that over time the Defendant would have built up a tolerance that would mask signs of impairment.  This issue was critical in the case *and there was no basis to keep such evidence out.* Counsel's actions cannot be deemed ineffective for failing to keep out *admissible evidence* relevant to a crucial issue at trial.

Ex. J, pp. 986-987 (emphasis added).

Petitioner challenged this finding on appeal, but cited no cases in support.  It was asserted in the appellate brief that "Ratchford conceded at the evidentiary hearing that this type of information occurs in some DUI cases, yet no apparent steps were taken by him to refute the State's contention."  Ex. K, p. 65.  It was argued that attorney Owens at the Rule 3.850 hearing testified that Ratchford should have objected, and if the evidence was presented (over objection), then Owens thought Ratchford should have offered opposing expert testimony.  *Id.*  At the hearing Owens said it was important to keep such testimony out *unless* there was a foundation that the accused had acquired behavioral tolerance, and if a motion *in limine* were denied, he said that he himself would have objected every time there was any testimony about it; he also thought that

the defense should counter it with expert testimony.  Ex. J, pp. 652-656.  But Owens

agreed that if the defense was that the person had little to drink and was not impaired,

then evidence of tolerance would be conditionally relevant to explain why he would

seem not impaired and yet have a high blood alcohol level.  *Id.*, pp. 677-678.  He

agreed the foundation could be established by asking people who had known Petitioner

for years, like Petitioner's brother.  *Id.*

No legal authority was cited In the state trial court, appellate court, or this court,

to show that this evidence could have been excluded on proper motion by defense

counsel.  Generally citing a treatise regarding conditional relevance,[35] or asserting that

another attorney would have done something differently, is insufficient to show deficient

performance or prejudice under Strickland.[36]  The trial court said there was no basis for

excluding this evidence, and this court defers to the state court's finding that a

successful challenge could not prevail under Florida law.  The issue as presented here

may have been raised in the Rule 3.850 motion and appeal, but was as insufficient then

as it is now.

Petitioner had a high blood alcohol level when tested hours after the accident.

His only real defense was to claim, as he did, that he was not impaired at the time of the

accident, and that his high alcohol level was due to drinking immediately *after* the

---

[35] In the Rule 3.850 motion Petitioner cited Ehrhardt § 105.2, which discusses
conditional relevance in general, but not behavioral tolerance to alcohol.  Ex. J, p. 375.

[36] As noted previously, the opinion of another attorney (or even the attorney
under scrutiny) that conduct was deficient does not demonstrate deficiency under
Strickland.  The fact that another attorney would have made an argument does not
show that the argument was, as a legal matter, a legally supported or meritorious one.

accident.  The prosecution had evidence that Petitioner was in two different bars, drinking some sort of liquid, throughout the evening preceding the accident, but it produced only two bartenders, each of whom had served one drink to Petitioner that night.  The defense was that Petitioner was drinking water rather than alcohol in this period, that these were the only drinks he had, and he did not even finish them.  Therefore, the defense could argue, Petitioner's high blood alcohol level was the result of his quick ingestion of alcohol after he returned home.  That the bartenders knew Petitioner (and would remember that he bought more drinks),[37] and the perception of others as to whether Petitioner was impaired, were relevant to the defense that he was not impaired before the accident.  Behavioral tolerance for alcohol was relevant to counter the defense.

As for the failure to call an expert to counter the State's evidence regarding behavioral tolerance to alcohol, Petitioner has never come forward with evidence, expert testimony or otherwise, which would have contradicted what the state's expert said about alcohol tolerance.  This assertion is insufficient on its face.  Petitioner is not entitled to relief on ground nine.

---

[37] The fact that the bartenders were familiar with Petitioner as a customer was asserted as supporting the defense that he bought only two drinks that night, because the bartenders recognized him and each had served him only one.  Ex. C, p. 1210.

**Recommendation**

For the foregoing reasons, it is respectfully **RECOMMENDED** that the § 2254 petition for writ of habeas corpus, challenging Petitioner Ackerman's conviction and fifteen year sentence for leaving the scene of DUI manslaughter, imposed by the Circuit Court in Escambia County, case 97-2862, be **DENIED WITH PREJUDICE**.

**IN CHAMBERS** at Tallahassee, Florida, on March 25, 2010.


s/     William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


## <u>NOTICE TO THE PARTIES</u>

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**